UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW VILCAUSKAS and<br>ROBERT BLOODGOOD III,<br><br>    Defendants. | Crim. No. 04-423-HA<br><br>ORDER |

HAGGERTY, Chief Judge:

Defendants assert that the Superseding Indictment against them should be dismissed because of unnecessary pre-indictment delay in the prosecution. More than five years elapsed between the government's initial investigation and the filing of the first indictment. Defendants allege that over that time crucial evidence has been irretrievably lost, and that they have suffered actual, non-speculative prejudice as a result.

1 - ORDER

BACKGROUND

The Superseding Indictment alleges that between August and December 1999, defendants engaged in a business known as "Empire Communications" (hereinafter Empire) in Portland and fraudulently conducted unauthorized use of the DSL Internet service provided by telephone company US West (now known, and hereinafter referred to, as Qwest). Allegedly, defendants gained unauthorized possession of approximately 966 Qwest accounts and thereafter used Qwest without authorization as an Internet Service Provider (ISP) to distribute unsolicited bulk e-mail. Defendants are alleged to have caused approximately 66,000 unauthorized uses of the Qwest Internet service for the purpose of distributing bulk e-mail.

The chronology of relevant events is detailed in Defense Exhibit 101, presented at an evidentiary hearing conducted on January 4, 2006. The Federal Bureau of Investigation (FBI) launched an investigation of defendants and their colleague Matthew Middleton in mid-1999, after Qwest issued an advisory regarding a flaw in its hardware that allowed unauthorized access into its Internet accounts. Agents for the FBI met with defendants and Middleton and issued a subpoena to Empire in December 1999.

In November 2000, the government issued a letter indicating that an indictment arising from its investigation would issue "shortly." In January 2004, over four years after the government's investigation began and over three years after the government warned of a forthcoming indictment, Middleton died in a house fire. In October 2004, more than five years after the government began its investigations, defendants were indicted.

///

STANDARDS

Delay between commission of the crime and indictment is generally limited by the crime's applicable statute of limitations, but in some cases the Due Process Clause of the Fifth Amendment of the United States Constitution requires dismissal of an indictment that was otherwise brought properly within the limitations period. *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992) (citing *United States v. Marion*, 404 U.S. 307 (1971)). "The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive pre[-]indictment delay." *United States v. Gregory*, 322 F.3d 1157, 1165 (9th Cir. 2003) (quoting *United States v. Sherlock*, 962 F.2d 1349, 1353 (9th Cir. 1989).

To succeed on a motion to dismiss an indictment for pre-indictment delay, a defendant must prove that actual, non-speculative prejudice was suffered because of the delay; this proof must demonstrate "exactly how the loss of evidence or witnesses was prejudicial." *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005) (citations and quotes omitted). A defendant's proof of actual prejudice must be concrete, definite, and not speculative. *United States v. Martinez*, 77 F.3d 332, 335 (9th Cir. 1996) (citing *Sherlock*, 962 F.2d a 1353-54)).

"The defendant's burden to show actual prejudice is heavy and is rarely met." *Barken*, 412 F.3d 1134; *see also Martinez*, 77 F.3d at 335 (a defendant bears a "heavy burden" to show that any pre-indictment delay caused prejudice); *Huntley*, 976 F.2d at 1290 (the task of establishing the requisite prejudice for a due process claim is heavy and the Ninth Circuit has found few cases since 1975 in which any circuit has upheld a dismissal resulting from a due process pre-indictment delay violation).

If the defendant has demonstrated actual prejudice, then the defendant must overcome a second burden: after weighing the delay against the reasons for it, the defendant must show that the delay offends fundamental conceptions of justice that lie at the foundation of civil and political institutions. *Barken*, 412 F.3d at 1134, citing *United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995) (quotations omitted); *see also Martinez*, 77 F.3d at 335 (when considering a motion to dismiss an indictment for pre-indictment delay, the court cannot balance the reasons for delay against prejudice suffered by a defendant until first deciding that prejudice has been sufficiently proved).

ANALYSIS

1. Prejudice From Delay

Defendants acknowledge that Empire purchased and used dial-up Internet access "in quantity" in 1999. They characterize Empire as a "lower tier ISP," providing services in a manner similar to other ISPs such as Qwest. Defendants assert that wholesale purchases of dial-up Internet access occurred commonly during the period relevant to this prosecution and would be in the form of lists of accounts, with a telephone number used to gain access. Purchasers of this access would not typically see the screen interfaces designed for consumers, but would instead simply enter names and passwords from the purchased list and then access the Internet.

Defendants also acknowledge that the 996 Qwest accounts at issue in this case appear to have been stolen, misappropriated or illegally obtained. Defendants assert that there is no indication that when they obtained the accounts, there was any reason to believe the accounts were stolen. They contend that the government's delay in indicting them inflicted actual, severe prejudice because they are now precluded from introducing evidence that Middleton purchased blocks of Internet accounts

legitimately in 1999, paid a market-reasonable price for those accounts, and had no grounds for suspecting that the accounts had been improperly gathered before they were sold to Empire. Not only was Middleton killed in a house fire during the five-year delay before defendants' initial indictment, but that fire also may have destroyed evidence that Middleton possessed. Moreover, evidence regarding market forces and practices for Internet access in 1999 has been irretrievably lost through common document purging policies practiced by service providers.

Although the government provided notice to defendants of the ongoing investigation in the five years leading to defendants' indictment, such notice failed to meaningfully assist defendants because they lacked subpoena powers and were unaware of the exact nature of the charges they would eventually face. They were precluded from collecting discovery from Qwest or other ISPs, could not examine the files regarding Qwest's and the FBI's investigations of the theft of the 996 accounts from Qwest at issue here, and had no reason to actively prepare a defense because the government references about a forthcoming indictment that were made to them in 2000 and 2002 proved false. When the indictment finally issued, Middleton was dead, documents and evidence had been lost or destroyed, memories had faded, and defendant's discovery was much more difficult.

At an evidentiary hearing conducted on January 4, 2006, defendant Bloodgood elicited testimony from Robert Young, who described how ISPs provide Internet access and that an active sales market for access accounts has existed for a number of years. Young testified that Qwest appears to purge customer records that date earlier than 2000. He also referred to records Qwest would have likely possessed regarding "modem pools," where telephone calls from computers seeking access to the Internet are received. These records would have included data that identified

5 - ORDER

the account "calling in" to the modem. Other data that might have been available at one time includes records showing that multiple computers, or multiple entities, were using the same account number for Internet access, and how the accounts being used for access were obtained or "harvested." Young testified that it is impossible to ascertain presently how or by whom the accounts at issue in this case were obtained. He also testified that records of account sales and purchases in 1999, as well as evidence necessary for determining reasonable prices for this kind of market in 1999, no longer exist. Before these kinds of records were purged, an entity's use of a specific account – and how that account was obtained – could have been traced and determined, and the market for the resale of bulk Internet access accounts could have been re-created.

The government's cross-examination of Young explored his familiarity with bulk sales of access accounts, how randomly generated account passwords might appear, and whether Young, based upon his experience, could estimate possible values for bulk account sales in 1999. These questions, and Young's answers, tended to establish that the current lack of data regarding the Internet, resale markets, and Qwest's records for 1999 is problematic for defendants.

Nevertheless, defendants fail to establish that any prejudice they have suffered because of the indictment's timing is concrete and definite. Instead, defendants speculate that there *might have been* evidence in existence during the last few years that could possibly bolster exculpatory theories. They speculate that had Matthew Middleton survived, he *might have* provided testimony or documentation that could have exonerated Empire. While it is true that Middleton's death, his house fire, and the records-purging policies of Qwest and other ISPs all have resulted in some degree of deprivation of evidence that would have been relevant to this prosecution, it is undeniably a matter of speculation as

to whether the loss of such evidence is more prejudicial to defendants or to the government, or whether the loss is prejudicial at all.

2.  Balancing

Because defendants cannot meet the heavy burden of demonstrating "exactly how the loss of evidence or witnesses was prejudicial," this court need not address whether the alleged prejudice they have suffered outweighs the reasons the government has proffered for the long delay and offends fundamental conceptions of justice. *Barken,* 412 F.3d at 1134.

CONCLUSION

For the reasons provided above, defendants' Joint Motion to Dismiss Indictment on Grounds of Pre-Indictment Delay [83] is DENIED.

IT IS SO ORDERED.

DATED this 12 day of January, 2006.

Ancer L. Haggerty
United States District Judge